Jerry COOPER, Plaintiff,

v.

JOHN D. BRUSH & CO., d/b/a
Sentry Group, Defendant.

No. 01–CV–6354L.

United States District Court,
W.D. New York.

Jan. 15, 2003.

Samuel F. Prato, Rochester, NY, for Plaintiff.

Edward A. Trevvett, Harris Beach LLP, Pittsford, NY, for Defendant.

## DECISION AND ORDER

LARIMER, District Judge.

### PROCEDURAL HISTORY

Plaintiff Jerry Cooper ("plaintiff") instituted this action against his former employer, defendant John D. Brush & Co., d/b/a Sentry Group ("Sentry"), alleging racial discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Plaintiff, an African–American, alleges constructive discharge and a hostile work environment based on his supervisor's disparate treatment and harassment. Plaintiff claims that the harassment went unremedied by Sentry after he reported it and, as a result, he was forced to resign his position as an assembly line employee. Before the Court are Sentry's motion for summary judgment, brought pursuant to Fed. R. Civ. R. 56, and plaintiff's cross-motion, brought pursuant to Fed.R.Civ.P. 56(f), for additional discovery. For the reasons that follow, Sentry's motion is granted and plaintiff's motion is denied.

### FACTUAL BACKGROUND

Plaintiff worked at Sentry from 1989 until his September 25, 2000 resignation. From 1996 through December of 1999 plaintiff's supervisor was Rick Comstock. Dkt. # 12, ¶¶ 7–9. Plaintiff alleges that Comstock discriminated against him in the Spring of 1998 when Comstock told a Sentry insurance representative that plaintiff intended to return to work on a particular date following knee surgery. Plaintiff claims that he had no intention of returning to full-time work for a few months and believes that Comstock made the false report because of plaintiff's race. Dkt. # 12, Ex. 8 at 23–27. When plaintiff raised the issue with Sentry's human resources manager, plaintiff refused to meet with Comstock about the incident. It is undisputed that Comstock's actions did not cause plaintiff to be disciplined or affect his job status or conditions of his employment in any way. *Id.* at 27.

In December of 1999, plaintiff began working under the supervision of Paula Pecora. Pecora reported to department manager Gary Stein. Dkt. # 12, ¶ 10. Plaintiff's allegations of discrimination and hostile work environment relate to the manner in which Pecora supervised him on the production line. Plaintiff asserts that Pecora "picked on" him because of his race and strictly enforced or improperly used Sentry's Rules of Conduct and Attendance Policy against him. Dkt. # 12, Ex. 8 at 47. Plaintiff claims that Pecora discriminated against him by attempting to write him up numerous times under Sentry's Attendance Policy for things he did not do. Plaintiff also alleges that Pecora harassed him by telling other employees that she was "going to get [him]" *Id.* at 36. Plaintiff alleges that Pecora took these actions because he was African–American.

Plaintiff bases his allegations on the fact that he heard from a coworker that Pecora had once referred to an Hispanic employee as a "dumb Mexican." *Id.* at 47. This is the only racial epithet plaintiff alleges Pecora used. Plaintiff does not allege that Pecora used racial epithets in his presence or directed any racial slurs at him. Plaintiff also asserts that two other African–American employees, Corey Seabrook and Robert David, "had trouble" with Pecora. According to plaintiff, both filed complaints with the EEOC or the State Division on Human Rights about Pecora's treatment of them. *Id.* at 52. Sentry denies that Seabrook filed discrimination charges with either agency or that either Seabrook or David complained to Sentry that Pecora discriminated against them. Dkt. # 14, Ex. B at 35–36. Rather, the record shows that Seabrook complained to Miller that Pecora once incorrectly marked him tardy. Dkt. # 14, Ex. B at 34.

In February of 2000, plaintiff complained to Sara Miller, Sentry's Human Resources Employment Manager, that Pecora had engaged in "unprofessional conduct" because she said loudly on the production line in the presence of other employees that his unauthorized absence from the line was "B.S. . . . send him to me, I want him, I'll write him up." Dkt. # 10, ¶ 12. The unauthorized absence was due to the fact that plaintiff had arranged with the production line's attendance person, Mr. DiMaria, to leave early one day for a court appearance and to make up the time at a later date. According to Sentry's Attendance Policy, however, DiMaria could not grant plaintiff that permission, only Pecora could. When plaintiff reported this conduct to Miller, he declined Miller's offer to speak to Pecora, and instead asked that Miller note that Pecora had acted unprofessionally. At no time during his discussions with Miller did he tell her that he believed Pecora was harassing him because of his race or that he believed Pecora engaged in discrimination. In addition, it is undisputed that plaintiff was not written up for his unauthorized absence in connection with the incident, despite the fact that Pecora could have done so in accordance with Sentry's Attendance Policy. Dkt. # 12, ¶¶ 23–26.

Plaintiff again complained to Miller about Pecora in March 2000 because she tried to write him up for another Attendance Policy violation in which he allegedly took a long lunch. Plaintiff denied the allegation and claimed that Pecora improperly wrote him up based solely on the word of a coworker, Dave Thompson. Dkt. # 12, ¶ 27. During plaintiff's meeting with Miller, plaintiff told her that he believed Pecora did not like him and was picking on him. Dkt. # 10, ¶ 20. When asked to specify how plaintiff believed Pecora was picking on him, plaintiff could not provide any substantive information or elaborate on any specific events. Dkt. # 10, ¶ 21. At no time during this meeting did plaintiff state that he believed Pecora did not like him because of his race or that he believed Pecora had engaged in discrimination.

After the second complaint to Miller, she held a meeting with plaintiff, Pecora, and Stein. Pecora denied picking on plaintiff and asked plaintiff to come to her in the future if he believed she was being unfair. Plaintiff agreed to do so and Pecora agreed to communicate better with plaintiff. Dkt. # 12, ¶ 31; see also Dkt. # 12, Ex. 8 at 55–56; Dkt. # 10, ¶ 23. Plaintiff was not written up for any Attendance Policy violation on account of this incident. Dkt. # 10, ¶ 25. Plaintiff also alleges that on two or three unspecified occasions, Pecora attempted to write him up for minor attendance infractions, including coming back late from a break. Plaintiff claims that Stein tore up Pecora's written warnings and plaintiff was not disciplined because of them. Plaintiff could not state the dates of these incidents, Dkt. # 12, ¶ 34; see also Ex. 8 at 43–45, and Sentry has no record that these incidents occurred. Id. at ¶ 35.

In early September of 2000, Sentry offered a voluntary separation package to its employees as part of a reduction in force ("RIF"), which was to become effective on September 15, 2000. Dkt. # 12, ¶ 45. Any employee choosing to participate in the RIF was to complete a written election form and return it to their supervisor by September 13, 2000. Plaintiff did not take advantage of the voluntary RIF because he intended to "stick it out." However, he claims that after the September 13 deadline passed, Pecora continued to harass him and watched him more closely than other employees. Dkt. # 12, Ex. 8 at 61. As a result, he claims he did not feel like coming to work on September 21 because

Pecora was putting too much pressure on him. *Id.* at 60.

On September 22, 2000 he was written up for his absence on September 21. Dkt. # 10, ¶ 27. Plaintiff had already had Attendance Policy violations on his record. In May of 2000, plaintiff was written up for failing to show up to work or calling to explain his absence. In November 1999, plaintiff was written up for being tardy three times in a 60–day period. Dkt. # 12, Exs. 10, 15. The September 21 incident gave plaintiff a total of eight "occurrences" pursuant to the Attendance Policy. If plaintiff received nine occurrences in a rolling 12 month period, it would result in his termination. Dkt. # 12, ¶ 42; *see also* Ex. 17. Plaintiff was given written notice of the violation and his current "occurrence" status.

On or about September 23, plaintiff approached Miller and requested that he be able to participate in the voluntary RIF. On September 25, after Miller addressed plaintiff's request with Sentry, Miller told plaintiff that Sentry could not allow him to participate because it was too late. Plaintiff immediately tendered his resignation to Miller. It is undisputed that plaintiff did not report to Miller that he was quitting because he felt Pecora was discriminating against him. Instead, he told Miller he no longer liked working there and thought he may start his own restaurant business. Dkt. # 12, Ex. 8 at 70. It is also undisputed that he remained silent about his feelings of discrimination at his exit interview with Miller. *Id.* at 71. On the exit interview form (which was completed by Miller), plaintiff told her he had "no issues" with either the working condi-

tions or corporate policies and benefits. However, plaintiff did report to her that he did not want to work for Pecora anymore, but would "rather not" discuss his reasons further. Dkt. # 12, Ex. 20. Plaintiff claims that if he told Miller that Pecora was harassing him, Sentry would not have taken any steps to address the issue. Dkt. # 12, Ex. 8 at 70–71.

At all times relevant to this suit, Sentry had a written Non–Harassment and Non–Discrimination policy that specifically prohibited harassment or discrimination based on race and provided several ways in which an employee could report that he or she believed they were discriminated against. It is undisputed that plaintiff received a copy of the policy. Dkt. # 12, Exs. 2, 3. It is also undisputed that plaintiff never filed a complaint of discrimination with Sentry against Pecora or Comstock pursuant to this policy. Dkt. # 10, ¶ 6; Dkt. # 12, Ex. 8 at 70–71.

## DISCUSSION

### 1. Plaintiff's 56(f) motion for further discovery

Before addressing the merits of Sentry's motion for summary judgment, I must address plaintiff's cross-motion for further discovery. In opposition to Sentry's motion, plaintiff submitted only an affidavit pursuant to Rule 56(f) [1] requesting that the Court defer ruling on the motion so as to allow further discovery from two witnesses, Corey Seabrook and Robert David. Plaintiff did not submit a memorandum of law in support of the motion, nor did he otherwise submit any opposition to Sentry's motion.

---

1. Fed.R.Civ.P. 56(f) provides:

(f) When Affidavits are Unavailable. Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's oppo-

sition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

■ The Second Circuit "has established a four-part test for the sufficiency of an affidavit submitted pursuant to Rule 56(f). The affidavit must include the nature of the uncompleted discovery; how the facts sought are reasonably expected to create a genuine issue of material fact; what efforts the affiant has made to obtain those facts; and why those efforts were unsuccessful." *Paddington Partners v. Bouchard,* 34 F.3d 1132, 1138 (2d Cir.1994) *citing Hudson River Sloop Clearwater, Inc. v. Dep't of Navy,* 891 F.2d 414, 422 (2d Cir.1989).

If a court finds that a request for discovery is based on speculation as to what might be discovered, the court can deny the request, even if properly and timely made. *Paddington Partners,* 34 F.3d at 1138; *Gray v. Town of Darien,* 927 F.2d 69, 74 (2d Cir.1991) ("In a summary judgment context, an 'opposing party's mere hope that further evidence may develop prior to trial is an insufficient basis upon which to justify the denial of [a summary judgment] motion'") *quoting Contemporary Mission, Inc. v. U.S. Postal Serv.,* 648 F.2d 97, 107 (2d Cir.1981); *Capital Imaging Assocs. v. Mohawk Valley Med. Assocs.,* 725 F.Supp. 669, 680 (N.D.N.Y. 1989) *citing Waldron v. Cities Serv. Co.,* 361 F.2d 671, 673 (2d Cir.1966) (citations omitted) (while "Rule 56(f) discovery is specifically designed to enable a plaintiff to fill material evidentiary gaps in its case ... it does not permit a plaintiff to engage in a 'fishing expedition'"), *aff'd* 996 F.2d 537 (2d Cir.1993).

■ Here, plaintiff's Rule 56(f) affidavit is deficient for several reasons. First, plaintiff makes no attempt to show how the facts sought are reasonably expected to create a genuine issue of material fact. Instead, he states in conclusory fashion that obtaining the sworn statements of Corey Seabrook and Robert David is "necessary to prove [his] case, to show discrimination and an issue of material fact" Dkt. # 14, ¶ 14. "Rule 56(f) is not a shield against all summary judgment motions. Litigants seeking relief under the rule must show that the material sought is germane to the defense, and that it is neither cumulative nor speculative." *Sundsvallsbanken v. Fondmetal, Inc.,* 624 F.Supp. 811, 815 (S.D.N.Y.1985). Plaintiff has not made the requisite substantive showing of materiality required at this stage.[2]

Second, plaintiff has not offered a reasonable explanation for his failure to obtain this discovery sooner. This is not a case where plaintiff has been "denied reasonable access to potentially favorable information." *See Robinson v. Transworld Airlines, Inc.,* 947 F.2d 40, 43 (2d Cir. 1991) (plaintiff permitted to discovery before having to oppose summary judgment where corporate defendant had not provided that discovery before it filed its summary judgment motion). Here, plaintiff had sufficient time in which to conduct discovery. In fact, just prior to the court-ordered discovery deadline, plaintiff requested a 60 day extension in order to conduct discovery from Sentry regarding these very facts.[3] The Magistrate granted

---

2. Seemingly, plaintiff seeks to buttress his allegations of racial discrimination against Sentry with evidence that others in Sentry's employ believe they were harassed by Pecora on account of their race. However, as discussed below, *see infra,* Part 2.C, even if plaintiff could present evidence that Seabrook and David filed complaints of discrimination, Sentry still would be entitled to summary judgment as a matter of law.

3. In his letter request to the Court seeking the discovery extension, plaintiff sought to discover "other claims of racial discrimination and disparate treatment made by African–Americans against supervisor Pecora and the defendant." Plaintiff also informed the court he intended to conduct the depositions of "other fact witnesses and complainants." Dkt. # 17, Ex. A. Plaintiff also referenced two coworkers

plaintiff's request, and the discovery deadline was reset to April 30, 2002. During that time plaintiff never served a notice of deposition for Seabrook or issued a subpoena to depose David. Dkt. # 17 at ¶ 9.

Plaintiff offers no explanation for his failure to use the discovery devices available under the Fed.R.Civ.P. to obtain the deposition of either witness. Instead, plaintiff claims that during the extended period for discovery, he spoke with Seabrook, who agreed to give him an affidavit and his State Division of Human Rights complaint. However, plaintiff claims that Seabrook did not return his attorney's phone calls. Despite the fact that plaintiff did not obtain the sought after discovery, he did not request more time from the Court to do so. Instead, he let the April 30 deadline pass without taking further steps to get the information. Plaintiff offers no explanation as to why he was unable to obtain the testimony of David.

After Sentry filed this motion for summary judgment, plaintiff's attorney hired a private investigator to interview Seabrook. According to the affidavit of the investigator, Seabrook told him that he had "had problems" with Pecora and filed a complaint with the State Division of Human Rights. However, Seabrook refused to give an affidavit because he was still employed at Sentry. Seabrook stated he would only testify if he was under subpoena. Dkt. # 14. Plaintiff has made no attempt to subpoena him.

While courts generally treat Rule 56(f) motions liberally, "[r]equests for discovery in the face of motions for summary judgment put forth by parties who were dilatory in pursuing discovery are disfavored." *Paddington Partners*, 34 F.3d at 1139. Given plaintiff's failure to use the simple discovery devices available to him, as well as his failure to explain why the informa-

tion requested would raise a genuine issue of material fact sufficient to defeat summary judgment, plaintiff's motion must be denied. Therefore, the court turns to the merits of Sentry's motion. *Powers v. McGuigan*, 769 F.2d 72, 76 (2d Cir.1985) ("where the discovery sought would not meet the issue that the moving party contends contains no genuine issue of fact, it is not an abuse of discretion to decide the motion for summary judgment without granting discovery.").

### 2. Hostile Work Environment Claim

### A. Timeliness

Initially, I reject Sentry's claim that only the part of plaintiff's claim based on acts occurring within 300 days of the date of plaintiff's EEOC charge is timely. The Supreme Court recently clarified the statute of limitations applicable to hostile work environment claims. In *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002), the Court held:

A hostile work environment claim is comprised of a series of separate acts that collectively constitute one 'unlawful employment practice.' 42 U.S.C. § 2000e–5(e)(1). The timely filing provision only requires that a Title VII plaintiff file a charge within a certain number of days after the unlawful practice happened. It does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability....

who allegedly filed complaints with the State Division on Human Rights or the EEOC.

The statute does not separate individual acts that are part of the hostile environment claim from the whole for the purposes of timely filing and liability. And the statute does not contain a requirement that the employee file a charge prior to 180 or 300 days 'after' the single unlawful practice 'occurred.' Given, therefore, that the incidents comprising a hostile work environment are part of one unlawful employment practice, the employer may be liable for all acts that are part of this single claim. In order for the charge to be timely, the employee need only file a charge within 180 or 300 days of any act that is part of the hostile work environment.

*Morgan*, 122 S.Ct. at 2074–75.

■ Here, the last act occurred on September 25, 2000, when plaintiff alleges that he was constructively discharged. It is undisputed that plaintiff filed an EEOC charge on February 22, 2001, well within the statute of limitations period. Dkt. # 12, Ex. 22. Accordingly, all of the allegations plaintiff raises in support of his hostile work environment claim will be considered by the Court in determining Sentry's motion. *Morgan*, 122 S.Ct. at 2074–75.

### B. Summary Judgment in Discrimination Cases

When deciding a motion for summary judgment brought pursuant to Fed. R.Civ.P. 56, a court's responsibility is to determine whether there are issues to be tried. *Duse v. Int'l Bus. Machs. Corp.*, 252 F.3d 151, 158 (2d Cir.2001); *see also Larsen v. NMU Pension Trust*, 902 F.2d 1069, 1073 (2d Cir.1990). Summary judgment will be granted if the record demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Larsen*, 902 F.2d at 1073. "A fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law.' ... An issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Lovejoy–Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 212 (2d Cir.2001), *quoting Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The general principles underlying summary judgment apply equally to discrimination actions. *Abdu–Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir.2001) ("It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases"). Although courts should be cautious about granting summary judgment in cases where motive, intent or state of mind are at issue, *see Dister v. Cont'l Group, Inc.*, 859 F.2d 1108, 1114 (2d Cir.1988); *Montana v. First Fed. Sav. and Loan Ass'n of Rochester*, 869 F.2d 100, 103 (2d Cir.1989), "the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to ... other areas of litigation." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.1985) (summary judgment rule would be rendered sterile if mere incantation of intent or state of mind would act as a talisman to defeat an otherwise valid motion). In determining whether summary judgment should be granted, the court resolves all ambiguities and draws all reasonable inferences in plaintiff's favor. *Cifarelli v. Village of Babylon*, 93 F.3d 47, 51 (2d Cir.1996).

### C. Hostile Work Environment

To defeat a motion for summary judgment based on a hostile work environment,

plaintiff must present sufficient evidence that would permit a trier of fact to find two things: (1) the existence of a hostile work environment; and (2) a specific basis for imputing the hostile environment to the employer. *Fitzgerald v. Henderson*, 251 F.3d 345, 356–57 (2d Cir.2001). For the reasons set forth below, I find that plaintiff has failed to raise a genuine issue of material fact on either element.

■ To establish a hostile work environment, plaintiff "must produce evidence that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment.'" *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir.2000) *quoting Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). It is not enough to show "[i]solated instances of harassment." *Cruz*, 202 F.3d at 570. "Rather, the plaintiff must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were 'sufficiently continuous and concerted' to have altered the conditions of [his] working environment." *Id. citing Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir.1997).

■ In examining whether a hostile work environment was created, courts look to the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23, 114 S.Ct. 367. "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment-an environment that a reasonable person would find hostile or abusive-is beyond Title VII's purview." *Harris*, 510 U.S. at 21, 114 S.Ct. 367.

With respect to racial harassment, a plaintiff "need not be the target of other instances of hostility in order for those incidents to support [his] claim. Nor must offensive remarks or behavior be directed at individuals who are members of the plaintiff's own protected class. Remarks targeting members of other minorities, for example, may contribute to the overall hostility of the working environment for a minority employee." *Cruz*, 202 F.3d at 570 (internal citations omitted).

Here, plaintiff bases his claim of a hostile work environment on the following facts: 1) in 1998, his then supervisor Comstock falsely reported to Sentry that plaintiff intended to return from work following surgery on a date sooner than plaintiff intended; 2) in February 2000, Pecora told plaintiff's coworkers that she was going to "get him" for violating Sentry's Attendance Policy by not seeking her permission to leave the line for a court appearance; 3) a March 2000 dispute with Pecora regarding charging plaintiff with an Attendance Policy violation based on the statement of a coworker; 4) Pecora's "watching" plaintiff closely in September 2000; 5) two unspecified incidents in which Pecora unsuccessfully attempted to charge plaintiff with Attendance Policy violations for minor incidents; 6) a statement by a coworker that Pecora called another coworker a "dumb Mexican"; and 7) that two other African-American employees at Sentry "had trouble" with Pecora and may have filed complaints against Sentry.

■ Viewing the evidence in the light most favorable to plaintiff, *see Cifarelli*, 93 F.3d at 51, I find a reasonable jury could not find in plaintiff's favor. The incidents alleged by plaintiff are insufficient in their severity or pervasiveness to constitute a racially hostile work environment. *See Williams v. County of Westchester*, 171 F.3d 98, 100 (2d Cir.1999). There is no

evidence in the record that either Comstock's or Pecora's conduct toward plaintiff was race-based. At most, plaintiff established that Pecora may not have liked him, but that is not enough. He must produce evidence that he was discriminated against because of his race, and he has failed to do so. *Richardson v. New York State Dep't of Corr. Serv.*, 180 F.3d 426, 440 (2d Cir. 1999).

Further, no reasonable jury would find that the acts of his supervisors were 'abusive'. That plaintiff felt he was "picked on" is insufficient to support a hostile work environment claim. *Williams*, 171 F.3d at 100–101 (plaintiff's subjective feeling of uncomfortableness about his work environment insufficient to create hostile work environment); *see also Ricks v. Conde Nast Publ'n, Inc.*, 6 Fed. Appx. 74, 2001 WL 273835 (2d Cir.2001) (unpublished opinion) (affirming grant of summary judgment to employer where plaintiff failed to assert sufficient evidence of a hostile work environment by alleging, among other things, "public humiliation" by her employer's verbal berating).

*Williams* is instructive. In *Williams*, plaintiff alleged that he did not have a good feeling about his employment, that a minority coworker had a "gut, personal feeling" that he did not belong in the office and that there was "an atmosphere of uneasiness", that plaintiff found a file with racist material near his office either, and that he was consistently given menial tasks despite his 28 year tenure with the employer. The Second Circuit affirmed the District Court's grant of summary judgment, after trial, for the employer on the grounds that these allegations were insufficient as a matter of law to constitute a racially hostile work environment. *Williams*, 171 F.3d at 101. The Court took note that Williams had not alleged that a single racial epithet was directed at

him or that racially derogatory comments were used in the workplace. *Id.*

Similarly here, plaintiff has failed to produce sufficient evidence that his work environment was "permeated with discriminatory intimidation, ridicule, and insult." *Harris*, 510 U.S. at 21, 114 S.Ct. 367. The plaintiff must show "more than a few isolated incidents of racial enmity." *Snell v. Suffolk County*, 782 F.2d 1094, 1103 (2d Cir.1986). "[T]here must be a steady barrage of opprobrious racial comments." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir.1997) *quoting Bolden v. PRC Inc.*, 43 F.3d 545, 551 (10th Cir.1994).

It is undisputed that the only racial epithet of which plaintiff is aware is an alleged comment reported to him by another co-worker who himself claims he heard Pecora call a third employee a "stupid Mexican." While hearsay racist comments not directed at plaintiff or even his particular race may be probative of a hostile work environment, such evidence must be produced by plaintiff in admissible form. *See Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 71 (2d Cir.2000) ("while second-hand comments may be relevant, a district court deciding a summary judgment motion must be provided with admissible evidence demonstrating the truth of the non-movant's assertions."); *Howley v. Town of Stratford*, 217 F.3d 141, 154–55 (2d Cir.2000). Here, plaintiff has not provided an affidavit from the co-worker who allegedly heard this statement.

In any event, even assuming plaintiff submitted that proof in admissible form, he would still fall woefully short of the required evidence needed to establish a hostile work environment. This is not a case in which repeated explicitly racist comments, jokes, and epithets were used. *See, e.g. Schwapp*, 118 F.3d at 106 (10 to 12 instances of explicitly racist conduct precluded summary judgment in hostile

work environment case). Instead, plaintiff bases his claim on his own subjective feelings about Pecora's conduct toward him, which is not enough. To sustain a claim, the conduct in question must objectively *and* subjectively create a hostile work environment. *See Harris,* 510 U.S. at 21–22, 114 S.Ct. 367; *Schwapp,* 118 F.3d at 110.

 Even if plaintiff could raise an issue of fact regarding the existence of a hostile work environment, Sentry would still be entitled to summary judgment because plaintiff cannot show a specific basis for imputing the hostile work environment claim to Sentry. When the alleged harasser is a supervisor, the employer is presumed to be absolutely liable for the harassment. *Faragher v. City of Boca Raton,* 524 U.S. 775, 807, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). However, where, as here, the employer takes no "tangible employment action" against the employee, its liability is subject to what has become known as the *Burlington/Faragher* affirmative defense.[4]

 To invoke the defense, Sentry must show that it (a) "exercised reasonable care to prevent and correct promptly any ... harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher,* 524 U.S. at 807, 118 S.Ct. 2275; *see also Burlington Indus. Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).

 Here, Sentry has shown its entitlement to this defense. There is no dispute that Sentry had a written Non–Harassment and Non–Discrimination policy that specifically prohibited harassment

or discrimination based on race. The policy specified several ways in which an employee could report that he or she believed they were discriminated against, including a confidential report to the Director of Human Resources, the Employment Supervisor, or the Benefits and Compensation Manager. According to the policy, Sentry would "promptly and effectively" investigate "in a confidential manner" any complaints of harassing conduct. Dkt. # 12, Ex. 2. The policy also stated that "any form of retaliation against employees for exercising their rights under this policy is strictly prohibited and will be treated as a violation of this policy to the same extent as discrimination or harassment." *Id.* It is undisputed that plaintiff received a copy of the policy. Dkt. # 12, Ex. 3. Based on these facts, Sentry has satisfied the first element of the defense. *See Leopold v. Baccarat, Inc.,* 239 F.3d 243, 245 (2d Cir. 2001) (employer met burden on first element by demonstrating the existence of an harassment policy and a complaint procedure); *Caridad v. Metro–North Commuter R.R.,* 191 F.3d 283, 295 (2d Cir.1999) (same).

Additionally, Sentry met its burden of showing that plaintiff's actions in failing to avail himself of the complaint procedure were unreasonable. It is undisputed that plaintiff never filed a complaint of discrimination with Sentry against Pecora or Comstock pursuant to this policy. Dkt. # 10, ¶ 6; Dkt. # 12, Ex. 8 at 70–71. At no time during any of the three or four discussions with Miller did plaintiff claim that he felt Pecora was discriminating against him on account of his race.

Plaintiff claims that he did not report that Pecora was harassing him because he

---

**4.** Here, plaintiff alleges constructive discharge. Because constructive discharge is not considered a tangible employment action in this context, *see Fitzgerald v. Henderson,* 251 F.3d 345, 357 (2d Cir.2001); *Caridad v. Metro–North Commuter R.R.,* 191 F.3d 283, 294 (2d Cir.1999), Sentry may assert the *Burlington/Faragher* defense.

believed Sentry would not have addressed the issue. Dkt. # 12, Ex. 8 at 70–71. However, this contention is belied by the record, which shows that Miller promptly investigated plaintiff's concerns that Pecora was "picking on" him and charging him with unfounded Attendance Policy violations by meeting with plaintiff, Pecora, and Pecora's manager. In addition, not one of the Attendance Policy violations that plaintiff claimed were improper was charged to him. As such, plaintiff's experience with complaints to Miller resulted in quick action and findings in his favor. Therefore, plaintiff's concerns that his complaints would not be addressed are insufficient to preclude summary judgment in favor of Sentry. *Faragher*, 524 U.S. at 807–08, 118 S.Ct. 2275 ("[W]hile proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing an unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense."); *see also Leopold*, 239 F.3d at 246 (finding employer entitled to defense where plaintiff failed to report harassment out of fear of reprisal or inaction by employer because "[a] credible fear must be based on more than the employee's subjective belief. Evidence must be produced to the effect that the employer has ignored or resisted similar complaints or has taken adverse actions against employees in response to such complaints."); *Caridad*, 191 F.3d at 295 (same). Accordingly, Sentry is entitled to summary judgment pursuant to the *Burlington/Faragher* affirmative defense.

### D. Constructive Discharge

■ Lastly, there is insufficient evidence to withstand summary judgment on the issue of plaintiff's constructive discharge. To establish a constructive discharge, plaintiff must show that his employer deliberately made his working conditions so intolerable that he was forced to resign. *Whidbee*, 223 F.3d at 73; *Stetson v. NYNEX Serv. Co.*, 995 F.2d 355, 360 (2d Cir.1993); *Pena v. Brattleboro Retreat*, 702 F.2d 322, 325 (2d Cir.1983). This burden is not an easy one to carry. The Second Circuit has held that a constructive discharge cannot be established simply through evidence that the "employee was dissatisfied with the nature of his assignments," "the employee feels that the quality of his work has been unfairly criticized," or "the employee's working conditions were difficult or unpleasant." *Stetson*, 995 F.2d at 360. Therefore, "a claim of constructive discharge must be dismissed as a matter of law unless the evidence is sufficient to permit a rational trier of fact to infer that the employer deliberately created working conditions that were 'so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'" *Id.* at 361, *quoting Pena*, 702 F.2d at 325.

■ In my view, no rational trier of fact could reasonably conclude from these facts that the benign incidents about which plaintiff complains made plaintiff's working conditions "so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Pena*, 702 F.2d at 325. The evidence shows only that plaintiff was unhappy with the watchful eye Pecora kept on his attendance and timeliness. Plaintiff claims he quit because he believed Pecora was putting too much "pressure" on him. Dkt. # 12, Ex. 8 at 70–71. That kind of employee concern does the not meet the stringent standard for demonstrating constructive discharge. *See Gray v. York Newspapers, Inc.*, 957 F.2d 1070 (3d Cir.

1992) (employee's subjective interpretation that continued employment would be uncomfortable and demeaning and would lead to demotion or termination in the future does not constitute constructive discharge).

It is not enough that a reasonable person would have "preferred not to continue working for that employer." *Spence v. Maryland Cas. Co.*, 995 F.2d 1147, 1156 (2d Cir.1993). Plaintiff must show that his job had become "intolerable" to the point that he was "forced into an involuntary resignation." *Pena*, 702 F.2d at 325; *Stetson*, 995 F.2d at 360 *quoting Clowes v. Allegheny Valley Hosp.*, 991 F.2d 1159, 1162 (3d Cir.1993) (even "hypercritical supervision" and "unfair and unwarranted treatment [are] by no means the same as constructive discharge."). Here, a reasonable jury could not find that Pecora's actions were abusive. In fact, plaintiff received an above average performance review from Pecora in July 2000 and, as a result, was given a raise. Dkt. # 12, Ex. 16. At the time of his resignation, plaintiff may have felt that he was treated harshly and unfairly, but he "could not reasonably have felt at that time that he had no alternative but to resign." *Stetson*, 995 F.2d at 361.

Further, plaintiff did not tell Sentry that the reason for his leaving was his perceived racial discrimination by Pecora. Rather, he stated that he no longer wanted to work and that he was thinking about opening his own restaurant. Under these circumstances, plaintiff cannot establish a constructive discharge. *See West v. Marion Merrell Dow, Inc.*, 54 F.3d 493, 498 (8th Cir.1995) ("[a]n employee who quits without giving her employer a chance to work out a problem is not constructively discharged"); *Clowes*, 991 F.2d at 1161 (reasonable employee will usually explore alternative avenues thoroughly before coming to the conclusion that resignation

is the only option). Accordingly, Sentry is entitled to summary judgment.

## CONCLUSION

For the foregoing reasons, Sentry's motion for summary judgment (Dkt.# 10) is granted, plaintiff's motion for further discovery (Dkt.# 14) is denied, and plaintiff's complaint is dismissed with prejudice.

IT IS SO ORDERED.